NOT DESIGNATED FOR PUBLICATION

No. 122,866

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of E.S.E., E.J.E., and E.A.E.,
Minor Children.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Opinion filed October 22, 2021. Affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, for appellant mother.

*Morgan L. Hall*, deputy district attorney, and *Michael Kagay*, district attorney, for appellee.

Before GREEN, P.J., ISHERWOOD, J., and MCANANY, S.J.

PER CURIAM:  In this consolidated appeal, M.T. (Mother) appeals the district court's termination of her parental rights for her two daughters, E.S.E. and E.A.E., and her son, E.J.E. (collectively Children). Mother argues that the district court erred in (1) finding Mother unfit, and (2) finding that Mother's unfitness was unlikely to change in the foreseeable future.

FACTUAL AND PROCEDURAL BACKGROUND

This consolidated appeal stems from the termination of Mother's parental rights over her three Children:  15-year-old E.S.E., 13-year-old E.J.E., and 6-year-old E.A.E.

Prior to the incident prompting this case, the Kansas Department for Children and Families (DCF) investigated episodes involving Mother and the Children on seven separate occasions. In July 2013, there was an unsubstantiated report of physical neglect. DCF offered family preservation services to Mother, but she declined to avail herself of that resource. In November 2013, DCF learned the Children were living in a home that lacked both water and electricity. In 2014, Mother gave birth to E.A.E. and the infant's cord tested positive for methamphetamine, which prompted DCF to offer Mother drug endangered services. Mother likewise refused that opportunity for assistance. In 2015, DCF received a report that Mother left the Children in the home at night unattended.

The family's challenges continued into 2016. In May of that year, E.J.E. experienced truancy problems, which Mother blamed on unreliable transportation. DCF again offered Mother family preservation services and she again declined to accept their offer of assistance. The truancy investigation remained open at the time the current case came to fruition.

On June 7, 2016, law enforcement officers found E.A.E. sitting on the curb in simply a diaper. Mother apparently entrusted the Children's care to an unidentified male, and he left the home and the Children, before Mother's return.

A few weeks later, on June 20, 2016, law enforcement officers received a report that an adult male perpetrated sex acts against eleven-year-old E.S.E. When Officers investigated, they encountered a neighbor who stated she was currently monitoring the

Children because Mother left a note on her door asking her to watch them. Mother returned home while the Officers were still present, and she appeared to be either "high or drunk." Officers took the Children into police protective custody as a result.

Two days later, Lani Deines, a child protective services worker, received the family's case and she contacted Mother to obtain her side of the story. Mother told Deines that her phone "crapped out" and she left around 9 a.m. to get it fixed. She explained that she left a note on the neighbor's door to watch the Children because she did not think the errand would take as long as it did. The call between Deines and Mother disconnected, so Deines went to the home to speak with Mother in person.

Upon Deines' arrival, Mother explained she was in the process of securing a new job and did not have time to go into the incident any further. Deines reminded Mother that her Children were in police protective custody, and they needed to discuss the situation. Mother simply continued walking toward her vehicle. Deines told Mother about the allegations, explained that there were concerns regarding substance use, and asked whether Mother would be willing to take a UA. Mother responded that substance use was not one of the original allegations, so she did not feel obligated to submit to one. Mother got in her car to leave, but then stopped Deines and stated that if the court ordered her to do a UA, or she otherwise found the time, she might complete the test.

Meanwhile, E.S.E. and E.J.E. participated in safe talk interviews and E.S.E. denied the sexual abuse allegations. She disclosed that she and E.J.E. were often left alone to watch their younger sister and figure out how to provide meals. E.S.E. explained that on the day in question it was E.J.E.'s turn to watch E.A.E., but E.J.E. fell asleep and forgot to lock the door. But E.J.E. contradicted that assertion and stated that they always had a babysitter and were never left alone.

3

In late June 2016, the State filed a petition seeking to have the Children declared Children in need of care (CINC) based on lack of care or control, inadequate care, and alleged abuse or neglect. The State later amended its petition to include details of the sexual abuse allegation involving E.S.E.

Carmen Thompson, another KVC caseworker, was also actively involved with the Children's case from June 2016 through August 2017. In that role, she established case plan tasks for Mother that included the obligation to secure housing and employment, comply with UA testing, and participate in mental health services.

During that time, E.S.E. confided in her placement family that she was sexually abused so the agency scheduled a second Safe Talk interview with her. This time, E.S.E. revealed details of multiple episodes that occurred in a townhouse right behind the Children's home. E.S.E. stated that Mother was unaware of E.S.E.'s whereabouts during the incidents, but Mother was aware the perpetrator had "a touching problem." Deines spoke with the perpetrator and while he admitted that he violated E.S.E.'s trust, he declined to discuss the details of the abuse because he had entered into a plea agreement with the district attorney's office. The perpetrator was subsequently convicted.

Through Deines' extensive inquiries into the Children's case, she confirmed the sexual allegations suffered by E.S.E., and determined that Mother consistently neglected to properly supervise the Children. Driven by the belief that Mother would persist with her pattern of leaving the Children unsupervised, Deines recommended their placement in State custody. The court conducted a temporary custody hearing, and Mother stipulated that the Children were CINCs. The court was also advised that Mother's recent hair follicle test was positive for amphetamines and methamphetamines.

On September 19, 2016, E.S.E. and E.A.E. were placed with S.E., their foster mother. E.S.E. remorsefully expressed to her foster mother that she was to blame for their out-of-home care because E.A.E. slipped out of the house after E.S.E. left to go visit a friend. A separate foster family welcomed E.J.E. into their home but the placement was short-lived because of E.J.E.'s defiant behavior. Throughout this case the agency struggled to locate an appropriate foster family for E.J.E. who could successfully and compassionately manage his behavioral challenges.

In November 2016, Mother again submitted a hair test that was positive for amphetamines and methamphetamines. She neglected to attend an additional test three months later but did complete a test the week after and the results were negative. Four months later, Mother failed to appear for a scheduled UA because she was detained in Douglas County on a traffic ticket. Within this period Shawnee County law enforcement officers arrested Mother for methamphetamine related offenses.

Throughout the time that the Children were in an out-of-home placement, Mother had a right to share visits with them at the mall. She was aware the visitation carried strict limitations, including a prohibition on leaving the mall with the Children. In any event, during one visit, Mother took the Children to her mother's house. E.S.E. later shared with her foster mother that they had gone to grandmother's house and the foster mother in turn informed the case worker about the forbidden outing. Mother later told E.S.E. that she was unhappy with her for divulging that they left the mall. This transgression, as well as the fact Mother routinely arrived more than 15 minutes late to visits with the Children, prompted Thompson to return the family's visits to the KVC office. Thompson believed that Mother's persistent tardiness disrupted the Children and demonstrated a lack of stability or consistency.

5

In April 2017, the agency recommended that the Children remain in out-of-home care because Mother had exhibited a lack of progress, routinely failed to be present at visits on time, neglected to attend a required mental health appointment, and had yet to obtain adequate housing for her and the Children.

A month later, Thompson learned that Mother was on the precipice of eviction from her apartment and did not have replacement housing in the wings. Maternal grandmother shared with Thompson that she had cosigned the lease and paid the rent on Mother's apartment but recently informed Mother she intended to discontinue those payments. Thompson believed that Mother's inability to pay her own rent highlighted that she was unable to provide for herself let alone the Children. She referred Mother to the Topeka Housing Authority as a potential resource.

Thompson also reached out to the employer where Mother claimed she worked and learned that Mother had not worked there for at least a month. Thompson asked Mother about the job and explained that providing misleading information could affect her case. Mother claimed that the restaurant's manager did not tell the truth.

Thompson also had significant reservations about Mother's choices in friends and dating partners. The Children's adult sibling, L.H., expressed similar concerns when interviewed by the caseworker. In one instance, Mother brought a boyfriend to a parenting class even though the man had not completed a background check and was under the influence of some substance to such a degree that he had to be physically removed from the building. Mother then briefly dated and became engaged very quickly to a man who was much younger than herself. Mother never provided the names of these men to KVC.

6

In July 2017, Thompson held steadfast to the position that out-of-home placement was the safest and most beneficial option for the Children. She requested that the court order another hair follicle test because Mother consistently failed to appear for scheduled UAs, and Thompson had suspicions that Mother tampered with the tests that she did complete.

Mother's visitation with the Children was continually plagued with difficulties, not the least of which was a failure to honor a scheduled visit with them immediately prior to Christmas in 2017. On that occasion, E.J.E. waited by the window at KVC and repeatedly expressed that every car which passed by was Mother's. He maintained his station for 45 minutes before becoming so emotionally distraught that a KVC worker needed to "peel" him away from the window. And Mother was under the influence, more than once, when she arrived for a scheduled visit with the Children.

In June 2018, Becky Mauer, took over as the Children's permanency case manager at a time when their reintegration with Mother remained the goal. Mauer believed that because Mother failed to attend several UA appointments, provided four positive hair follicle tests, and potentially falsified drug tests, a sufficiently stable period of active recovery continued to elude her. She modified Mother's testing protocol to place her on twice weekly drug screenings because Mother's drug of choice was methamphetamine, and the body processes that substance so rapidly that it often flies under the radar of certain testing procedures. Mother's first test yielded a result that was positive for both methamphetamines and THC. In the two months that followed, however, Mother attended each of her scheduled UAs and consistently tested negative.

In August 2018, KVC referred Mother and E.S.E. to family therapy with Greg Seuferling, to address the sexual abuse E.S.E. sustained and Mother's relationship with E.S.E. Seuferling scheduled regular weekly therapy sessions for the two between October 19, 2018, and March 15, 2019, but Mother's attendance was sporadic and her investment

in those sessions was shallow at best. Two notable incidents occurred during the sessions that Mother did opt to attend. During one, rather than focusing on repairing the relationship with her daughter, Mother spent the session exchanging text messages with a man and explained to Seuferling and E.S.E. that the man wanted to be in a relationship with her, but the feelings were not mutual. Not easily dissuaded, the man pursued a more direct route and called, at which point E.S.E. told Mother "Here let me tell him to stop," then answered the phone and told the man to leave Mother alone. During another session, Mother received a text from Father and E.S.E. took the phone and called him. The exchange proved difficult for E.S.E. and she was reduced to tears, but Mother did not see fit to intervene and terminate the conversation. Father did so by simply hanging up on E.S.E., which intensified her distress.

Unfortunately, the number of appointments Mother neglected to attend exceeded those for which she was present. She attributed her absenteeism to various factors including car trouble, work, incarceration, headaches, or confusion as to scheduling. Therapy was ultimately terminated based on Mother's dereliction.

The court conducted a hearing in October 2018, and Mauer recommended the addition of adoption as a concurrent goal of the case because she had not witnessed appreciable progress by Mother.

Unfortunately, a marked improvement did not manifest over the course of the months which followed as necessary to nudge Mother closer to the goal of reintegration. During that time, Mother was either unwilling or unable to provide Mauer with proof of income and refused to share her address with or allow Mauer to visit the home. Mauer was thus without the means to verify whether Mother had any residence at all, not to mention suitable housing.

The greater and perhaps more significant burden which Mother was unable to get out from under was her addiction to illicit substances which, in some measure compromised her ability to meaningfully parent the Children under the circumstances. One time, E.J.E. gave money to Mother during a visit so that she could order items from Amazon for him. When he told his foster mother, B.C., about it later that evening, B.C. told him she would be happy to place the order for him. E.J.E. contacted Mother and asked her to bring his money back at the next visit but she told him she no longer had it because she used it to pay his older sister's cell phone bill. Mother never reimbursed E.J.E. for the money she took. During another episode, Mother unilaterally decided to pay an unannounced visit to the Children while they were staying at the home of Mother's sister, A.T., who was under consideration as a placement option for the Children. A.T. refused to allow Mother to see the Children. Undeterred and believing the Children to be just beyond the threshold of the door, Mother called their names because she knew E.A.E. "would be the first to run and be like, let me see my mama." A.T. contacted Mauer and law enforcement and then secured a no trespass order against Mother. In yet another incident, Mother arrived for a scheduled visit with the Children and was unquestionably under the influence. She became belligerent when asked to provide a UA but ultimately relented. The clear, odorless liquid she submitted yielded a negative result, but suspicions that Mother tampered with the test led to the request for a hair follicle test. The results of that test were positive.

Going forward, Mother opted to pursue a path of actively concealing her continued abuse from the agency and, by association, rejecting the assistive resources designed to pave the way toward recovery and reintegration. Specifically, Mother was deceitful with the administrator of a substance abuse assessment tool and was absent from more than 32 days of scheduled UA tests. That persistent dereliction caused dismissal from her designated UA protocol on two separate occasions. The agency finally cancelled Mother's visits with the Children until she could legitimately provide two clean UA tests. Sadly, Mother's addiction continued to chart the course of the case. She

9

returned multiple positive UAs for methamphetamine, THC, and even dabbled in LSD on occasion in a calculated effort to skirt detection. Following a series of UAs that were positive for amphetamines, Mother told Mauer that she was taking Vyvanse, an ADHD medication, which Mauer knew would test positive for amphetamines. Mauer did not believe her given that Mother's positive test results were merely sporadic, while daily ingestion of Vyvanse would yield a positive result for amphetamines every time.

This albatross around her neck unfortunately, but not surprisingly, also led to Mother's continued participation in criminal conduct. She acquired new charges and convictions for drug related offenses, among others, in several jurisdictions across the State. Together with neglecting what she needed to accomplish personally before reintegration could become a reality, Mother likewise increasingly disassociated from the stability and emotional security the Children required. She shirked visits more than once to avoid an arrest for outstanding warrants, but in one instance she neglected to meticulously plot her coordinates and officers arrested her in the Children's presence during a visit.

On July 8, 2019, the State moved for a finding of unfitness and to terminate Mother's parental rights.

Sadly, the trauma and emotional strain of the case drove E.S.E. to attempt to take her own life. As a result, Chloe Rogers, a therapist, began working with E.S.E. During their appointments, E.S.E. shared with Rogers that Mother was not present in her life and she had not had a lot of contact with her the past few years. E.S.E. related that she would like a relationship with Mother but prefers to live with her foster mom because she enjoys the consistency at foster mother's house and feels as though she has a family in that home. Unlike her own house where she felt like the mother and carried the responsibility of caring for her younger siblings. E.S.E. told Rogers that she would like to be adopted. Rogers diagnosed E.S.E. with unspecified depressant disorder based on her feelings of

hopelessness and loneliness. Around this time, Mother showed up to E.S.E.'s high school to see her even though Mother was not supposed to have contact with the Children. The school turned Mother away, but she then simply used a sister's child to pass a note to E.S.E.

On January 28, 2020, the district conducted a three-day termination hearing. Mauer testified to the events which transpired over the course of her assignment with the family and stated that resolving the case with an eye toward permanency was in the best interest of the Children. Her determination was that Mother was unfit at that point in time and the conduct which served as her foundation for that conclusion was unlikely to change in the foreseeable future. Thompson likewise testified and detailed her experience with the Children's case. She remarked that at the outset of her assignment to the family, Mother seemed committed to the effort required to achieve reintegration, but her compliance declined over time.

Seuferling was also called as a witness and testified that in undertaking therapy the overarching goals are to rebuild trust and discuss the expectations and roles for each person. Seuferling believed Mother's failure to make attendance at therapy with E.S.E. a priority adversely impacted E.S.E.'s trust issues and that the occurrence of particular incidents reflected that E.S.E. had the parental role in the relationship. Finally, he offered the opinion that based on his sessions with E.S.E., he believed that she wanted to maintain a relationship with Mother but did not want reintegration.

E.S.E.'s foster mother, S.E., also testified and corroborated the assertion that E.S.E. exhibited a parental role in the family. As an example to buttress her conclusion, she explained that when receiving food, E.S.E. would immediately split it with E.A.E. and S.E. had to explain that E.A.E. would receive her own. S.E. also shared with the court that upon E.A.E.'s arrival in her home, the young girl spoke very little so S.E. at first explored the possibility of speech therapy with KVC, but after spending time simply

reading and talking with E.A.E. the child's language skills improved. S.E. testified that the girls do not request to see Mother, that E.S.E. often expressed not feeling cared about by Mother and explicitly told S.E. that she does not want to live with Mother. It was possible the sentiment was due in some measure to Mother's chronic tardiness to scheduled visitations or failure to appear at all. Finally, S.E. informed the court that she believed Mother could not provide for the girls because over the past three years, Mother has exhibited "a never-ending cycle of broken promises," a lack of sobriety, and inability to make decisions in the Children's best interests.

E.J.E.'s foster mother, B.C., also testified and explained that E.J.E. is currently a completely different boy than he was when he first arrived in her home. That is, he is respectful, succeeding in school, and no longer carries an angry attitude. According to B.C. that positive demeanor would suffer during visits with Mother and he would be argumentative and whiney when he returned to B.C.'s home. B.C. shared with the court that when family visits were first terminated, E.J.E. asked to see Mother but he has not requested to see her since that time. B.C. stated that E.J.E. thrives in an environment with structure, boundaries, and where a male role model is actively involved. She shared that E.J.E. expressed a desire for adoption and to live the life of a normal child.

The State asked the district court to take judicial notice of Shawnee County cases 2017-CR-1760, 2000-TR-7979, 2016-TR-2653, 2017-TR-8078, 2019-TR-4990, 2019-TR-9516, and rested.

Mother called Kristen Bell as a witness. Bell is a licensed addictions counselor who testified to working with Mother at New Dawn in the months before the termination hearing. Bell informed the court that Mother had not submitted a negative UA during their time together and completed Level I treatment but expressed a desire to continue so Bell assigned her to the continuing care relapse prevention groups. When asked whether Mother could stay sober, Bell responded that "addiction is a forever disease," that

12

requires an ongoing commitment, but Mother could capably weather traumatic events without resorting to the use of drugs. She remarked that Mother has exceeded the requirements to establish that she desires reintegration with her Children and will do whatever is necessary to maintain her sobriety. Bell was also asked whether her answer would change if she were told that Mother once completed treatment but failed to reman sober. Bell stated her opinion would remain unchanged because she believes that everyone eventually reaches a point where they decide whether to remain sober and that Mother was currently in that place.

Mother also called her sister, T.C., as a witness and she informed the court that over the course of the preceding few months she had witnessed a maturation in Mother as well as an active effort to heal damaged relationships. It was T.C.'s position that no one's life is immune from difficulties, but she saw nothing but positive days ahead for Mother. T.C. acknowledged that her observations were limited to the three or four months immediately preceding the termination hearing. Before that time, Mother's whereabouts were unknown to T.C. and they did not communicate with one another.

Mother's oldest sister, A.T., also testified on Mother's behalf. She informed the court that Mother was prepared to resume parenting the Children and could do so successfully. As support for her assertion, A.T. shared that mother's spirituality was now more deeply rooted, her physical well-being was a greater priority, and she has a strong emotional support system consisting of both friends and family. Additionally, in A.T.'s opinion, Mother had developed a deeper appreciation for what loving, supporting, and encouraging the Children truly requires.

Mother's eldest child, L.H., testified that she too has witnessed several changes in Mother in the last three or four months and currently their relationship is the strongest it has ever been. She noticed Mother is taking better care of herself and possess a more peaceful demeanor. She believed Mother now exhibited the requisite degree of

responsibility to resume parenting the Children. When pressed, however, L.H. admitted that Mother's history with recovery and commitment was one of hills and valleys. She could not explain why she believed it is necessary to view Mother's behavior differently this time and simply reiterated that Mother demonstrated improvement and her accomplishments were "respectable and honorable."

Finally, Mother testified on her own behalf. She explained that she undertook measures to clear up her array of criminal charges but acknowledged that incarceration for her felony charge remained a possibility. When asked why her arrest occurred during a visit with the Children, she claimed she notated the wrong court date which in turn prompted the warrant. It was her position that the Children's seeming desensitization to the incident was not a product of witnessing the same so many times previously. Rather, it was because they understood it would be short lived. It was Mother's contention that she would not have accrued any of the criminal cases she picked up over the years if her kids were with her because they keep her "more in line." But after the removal of her Children, life spiraled out of control.

Mother informed the court that her absences from visitations, therapy, and UAs were not because of dereliction, they were simply unavoidable. For example, she was unable to leave work, lacked transportation or, in some instances, was in jail. Mother also asserted that suitable housing was never an issue, then listed for the court the six different residences she had throughout the case. Mother also shared that she secured a good, stable job that provides family insurance and which recently awarded her a raise and promotion.

As for drug tests, Mother remained steadfast in her theory that her ADHD prescription was responsible for the UAs that yielded a positive result for amphetamines. Mother claimed she did not have any positive UAs following her release from jail and the positive test suggesting the contrary to be true for marijuana was possibly because she

borrowed someone's vape at work. When asked why her hair test would be negative for amphetamines, but her UA was positive, Mother explained that it was because the KVC worker did not cut the hair close enough to her head. She did highlight her completion of a drug treatment class and her continued participation in an aftercare program that she attends voluntarily through the benefit of the insurance at her new job.

Mother blamed the duration of this matter on KVC and that the rotation of workers assigned to her case compromised consistency and rendered the agency unable to keep matters in order. She did acknowledge that her lack of compliance also contributed to the delay. Mother informed the court that she aimed to get her life on the proper path after the State moved to terminate her parental rights. Mother asserted that she attends therapy on a weekly basis, but when confronted with an email that her therapist sent to KVC stating that because of Mother's work schedule and the therapist's schedule, sessions had not been consistent, Mother acknowledged that was accurate.

Mother expressed an awareness of her mistakes and that those failings injected trauma into the Children's lives but assured the court that the past eight months she was fortunate enough to enjoy strong emotional support, sobriety, and beneficial drug treatment. She explained that she did not complete drug treatment before or attended simply because she was mandated to do so, but this time was different as she felt motivated to attend on her own accord and ensure it was meaningful. Mother acknowledged her need to regain the Children's trust but did not believe it would require a long duration. She believed it was acceptable and not otherwise unfair to the Children to delay permanency until she firmly established that trust because in her mind it would be "beneficial in the long run."

On February 4, 2020, the district court found Mother unfit, determined that her unfitness was unlikely to change in the foreseeable future, and concluded that it was in

15

the best interest of the Children to terminate Mother's parental rights. Mother timely appealed.

LEGAL ANALYSIS

DID THE DISTRICT COURT ERR IN FINDING MOTHER UNFIT?

A parent has a fundamental liberty interest in the right to make decisions regarding the care, custody, and control of their child. But a parent's constitutional rights are not without limits. See *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019). The Revised Kansas Code for Care of Children governs the procedure for the termination of parental rights. K.S.A. 2020 Supp. 38-2201 et seq.

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights . . . when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a).

To determine whether a parent is unfit, the district court shall consider but is not constrained by the statutory factors set forth in K.S.A. 2020 Supp. 38-2269(b).

The district court found Mother unfit under six of the statutory factors, including (1) Mother's use of intoxicating liquors or narcotic or dangerous drugs was of such duration or nature as to render Mother unable to care for the ongoing physical, mental, or emotional needs of the Children; (2) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; (3) Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the Children; (4) as a result of actions or inactions attributable to Mother and one or more of the factors listed in K.S.A. 2020 Supp. 38-2269(c), the Children have been in the custody of the secretary

16

and were not placed with either parent for 15 of the most recent 22 months; (5) Mother failed to maintain regular visitation, contact, or communication with the Children or with the custodian of the child; and (6) Mother failed to carry out a reasonable plan approved by the court directed toward integrating the Children into a parental home. See K.S.A. 2020 Supp. 38-2269(b)(3), (7), (8), and (9); K.S.A. 2020 Supp. 38-2269(c)(2) and (3).

Mother contends the district court's findings are not supported by clear and convincing evidence.

> "'When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, i.e. by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]'" In *re K.L.B.,* 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

In doing so, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 56 Kan. App. 2d at 445.

> *(1) Mother's use of intoxicating liquors or narcotic or dangerous drugs was of such duration or nature as to render Mother unable to care for the ongoing physical, mental, or emotional needs of the Children.*

The district court found that because Mother consistently engaged in the use of illicit drugs, used a prescription containing amphetamines, submitted multiple positive UAs, exhibited a pattern of no-shows throughout the case, and appeared at visits with the Children disheveled and under the influence, there was clear and convincing evidence to support this factor.

Mother argues that while there was evidence which reflected that she had an issue with drugs, the State failed to present evidence that clearly established her drug use adversely impacted her ability to parent the Children in a healthy, meaningful way. In

support of her contention, Mother highlights the fact that since November 2017 her UAs have regularly yielded a negative result and her follicle tests have likewise been clean. She acknowledges that she missed her June 2019 UAs, but explains it was because she was in jail and that upon her release, she got involved in a drug treatment program.

The State counters that it did not have to show direct evidence of her inability to parent. It claims that because Mother's pervasive drug use prompted the agency to severely curtail her visits with the Children and that drug use was intertwined with her persistent criminal conduct, the court's reliance on this factor was supported by a clear and convincing evidentiary foundation.

Mother is correct that termination under this factor requires evidence that her drug condition rendered her unable to properly care for the Children. See In re S.B., No. 120,362, 2019 WL 2479456, *11 (Kan. App. 2019) (unpublished opinion). But the State is likewise correct that it does not carry the burden to present direct evidence which shows that drug use undermined her ability to parent and reintegrate with the Children:

> "Any material fact may be proven not only by direct testimony, but also by indirect or circumstantial evidence, or by a combination of both. The State is not required to provide direct evidence that a parent's conduct is due to drug use if sufficient evidence shows that drug use impeded reintegration. Similarly, the State need not provide direct evidence that a parent's drug use is in and of itself harmful to a child where clear and convincing evidence shows that the parent's failure to acknowledge his [or her] drug issues creates a significant impediment towards reintegration. [Citations omitted.]" In re M.S., 56 Kan. App. 2d 1247, 1258-59, 447 P.3d 994 (2019).

Following a comprehensive review of the evidence in the light favoring the State, we are satisfied there is clear and convincing evidence to support the court's conclusion that Mother's drug use constituted a significant impediment toward reintegration.

First, the evidence established that Mother actively battled a methamphetamine addiction since at least 2014 when E.A.E. was born. Throughout the first two years of the case, Mother either failed to appear for scheduled UAs or submitted tests which yielded a positive result. In direct response to Mother's drug abuse, KVC declined to allow her to visit with the Children outside the agency offices.

Between the October 2018 and February 2019 hearings, the restrictions on Mother's visitations intensified after she arrived at visits while she was under the influence of illicit substances. During roughly that same period, Mother failed to appear for testing for 32 consecutive days and was dismissed from her UA program as a result. A direct consequence of Mother's inability or unwillingness to rein in her drug use was suspension of her visitation with the Children until she could successfully complete two negative UAs. Unfortunately, as evidenced by the record before us, Mother's pattern of no shows and positive results for amphetamines and methamphetamines continued and therefore the chasm between Mother and the Children widened. Thus, Mother's drug use was a significant impediment in the effort toward reintegration.

Additionally, throughout this time, Mother acquired several new drug related criminal charges. In 2017, she faced charges in Shawnee County for possession of a narcotic or stimulant and possession of drug paraphernalia with intent to use. In February 2019, Mother's unruly behavior at a casino led to her no contest plea to battery and possession of drug paraphernalia with intent to use. A mere four months later, Mother found herself in custody in a Lyon County jail for a conglomeration of new and outstanding charges, including possession with intent to distribute, forgery, criminal possession of a weapon, possession of drug paraphernalia, theft, and failure to appear. The added impact of that restriction on her freedom was that it compromised her ability to participate in UAs and hair tests as required under the reintegration task plan. Thus, her drug use led to criminal liability, which in turn inhibited her ability to successfully undertake the steps required to reintegrate with the Children.

An assessment of the evidence in a light favoring the State, as we are required to do under our governing standard of review, reveals there is clear and convincing evidence to support the district court's finding that Mother's persistent drug use rendered her unfit.

*(2) Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family*

The district court found that two separate KVC workers devoted significant time to restoring this family, even before the time the Children were taken into police protective custody, but Mother consistently refused their rehabilitative efforts.

Mother argues that the fact she had a stable residence throughout the case and provided a series of negative UAs after June 2019 undermines the district court's conclusion. She also asserts that the district court's determination ignores the reality that the agency assured her she could share a visit with the Children in December 2019, provided her drug tests were clear but then reneged on its promise.

The fallacy in Mother's argument, however, is that it fails to truly challenge the district court's finding. Rather than outlining the agency's missteps, Mother instead endeavors to shift the focus of the analysis to examples of her own compliance with the reintegration plan. The only true shortcoming she highlights is the agency's refusal to facilitate the December 2019 visit. Yet as Mauer explained during her testimony before the district court, the results of Mother's UAs in the 90 days preceding that potential visit were merely one factor to consider in the overall assessment of whether the visit could be permitted to occur. The agency was also required to remain mindful of whether that interaction was in the Children's best interest. As that day neared, Mauer concluded that a visit would be emotionally detrimental to the Children.

The record before us establishes that the district court's conclusion is supported by clear and convincing evidence. Before the time officers took the Children into police protective custody, Mother twice refused the agency's offers of family preservation services and declined the added hand they extended to help her overcome her struggle with substance abuse. Following the Children's removal from the home, the agency undertook exhaustive efforts to make reintegration of the family a feasible goal. The workers assigned to the case outfitted Mother with the means to undergo a substance abuse assessment, established family therapy between Mother and E.S.E. with an eye toward repairing their relationship, provided Mother with a referral to the Topeka Housing Authority when she lost her residence, and finally, they scheduled and facilitated visitation between Mother and the Children. The failure of those measures to have a meaningful effect on the case lies at Mother's feet, not the agency's. The substance abuse assessment did not yield a pathway to recovery because Mother was not forthcoming with the administrator of the test. Therapy fell short in providing the tools to repair the relationship between Mother and E.S.E. because Mother declined to make attendance at their sessions together a priority. Finally, the agency discontinued visitations between Mother and the Children until Mother could get her drug use under control. A fair review of the evidence in a light favoring the State reveals there is clear and convincing evidence that KVC made reasonable efforts to rehabilitate the family, but those efforts failed.

*(3) Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the Children*

The district court determined that to meet the Children's needs it was incumbent upon Mother to modify her conduct, but clear and convincing evidence illustrated that she failed to do so.

Mother contends the district court reached its determination of this factor in error. It is her position that to arrive at such a conclusion, the court necessarily turned a blind

21

eye to her acquisition of suitable housing and stable employment and discounted her active involvement in substance abuse treatment in the months preceding the termination hearing.

Mother's argument under this factor amounts to a claim that the district court incorrectly weighed the evidence before it and a request for us to reassess the same. We must decline her plea as this court does not reweigh conflicting evidence or redetermine questions of fact. In re K.L.B., 56 Kan. App. 2d at 445. Even assuming Mother had stable housing and employment, which is not entirely supported by the record, there is clear and convincing evidence that Mother failed to adjust her circumstances to meet the Children's needs.

As reflected in our earlier detailed account, because of the unfortunate hold Mother's drug use had on her, she afforded those substances top priority to the exclusion of compliance with testing and treatment. Her consistent shortcomings in this regard required KVC to gradually whittle down her opportunities to visit the Children until their well-being finally demanded that visitations be terminated indefinitely. When Mother attended visits with the Children, she often disregarded the rules KVC imposed on those meetings, and often arrived late or not at all. Mother's approach to family therapy suffered similar infirmities. Her attendance was lackluster, and that frequent absenteeism caused the termination of therapeutic services. Running parallel to Mother's drug dependency was her continued involvement in criminal conduct. At the termination hearing, Mother acknowledged that her pending felony charge in Lyon County carried a potential prison sentence.

Mother's heightened focus on her drug treatment and mental health during the three months before the termination hearing are laudable. The district court could not, nor can we, turn a blind eye to the fact that the Children waited more than three years for Mother to make some appreciable commitment to rehabilitation and recovery. The

22

unfortunate reality, given Mother's history, is that there is no guarantee Mother will remain on the upswing and finally sever ties with those behaviors that brought the family to this point. We can say, without reservation, that there is clear and convincing evidence to support the district court's conclusion that despite being afforded many resources and opportunities to travel a different road, Mother consistently failed to adjust her circumstances, conduct, or conditions to meet the needs of the Children.

### (4) Mother failed to maintain regular visitation, contact, or communication with the Children

The district court found that the Children were out of the home for a little over three years and during that time, Mother often missed appointments and visits. Thus, it could not be said that Mother successfully adhered to her obligation to maintain regular visitation, contact, or communication with the Children.

Mother's foundation for relief under this issue is limited to a single sentence: "Mother specifically met the agency's conditions for visitation only to have that visitation cancelled at the last minute because the worker changed her mind." This assertion merely highlights an isolated incident from the greater volume of information before the court under this category. Thus, it is conclusory and only incidentally briefed, affording us the latitude to consider it abandoned. *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018). Even so, following a review of the evidence in a light favoring the State, we are satisfied it is clear, convincing, and bolsters the district court's conclusion.

As discussed above, Mother's unwillingness to comply with treatment and inability to provide consistent, positive test results, directly and adversely impacted her opportunity to spend time with the Children. Unfortunately, the pared down visitation schedule did not motivate Mother to improve her behavior. Rather, she neglected to prioritize the limited time the agency allotted her with the Children and at times failed to

show up for scheduled visitations. An assessment of the extensive case history, in a light favoring the State, reveals clear and convincing evidence to support the district court's finding that Mother failed to maintain regular visitation with the Children during their roughly three-year separation.

*(5) Mother failed to carry out a reasonable plan approved by the court directed toward the integration of the Children into a parental home*

The district court determined that despite having over three years to do so, Mother failed to carry out a reasonable, court approved plan directed toward reintegrating the Children back into her home.

Mother contends the court reached its conclusion in error given that she completed either a "majority" or "all" of her case plan tasks by providing evidence of stable housing, sufficient income, clean UAs, and drug treatment.

Mother fails to direct us to that portion of the record which verifies her claim. By contrast, our review of the case yields the conclusion that the district court's finding rests on a solid evidentiary foundation. KVC workers provided evidence that the case plan tasks required Mother to secure stable housing and employment, comply with the UA testing protocol, complete a substance abuse assessment, and participate in family therapy. Thompson testified that Mother participated at the start of the case, but her compliance waned over time. She acknowledged that Mother did secure a residence, but it was too small to provide adequate housing for their family of four, so it did not satisfy that component of the case plan.

24

As we have mentioned several times throughout this opinion, Mother's approach to drug testing fell considerably shy of that properly classified as "compliant." We reiterate that Mother's sporadic participation in visitation with the Children and family therapy also failed to demonstrate a firmly rooted commitment to whatever was necessary to repair and reunite the family. Notably, the evidence provided by KVC clarifies that the reason the permanency goal shifted from reintegration to adoption was because several months passed without Mother making any progress in the case plan tasks. A comprehensive review of the evidence surrounding this factor, in a light favoring the State, enables us to find that there is clear and convincing evidence to support the district court's conclusion that Mother neglected to successfully carry out a task plan that would ultimately allow integration of the Children back into the home.

In sum, taking the evidence in the light most favorable to the State, there was clear and convincing evidence to support each of the six factors the district court relied on for its finding that Mother was unfit.

### Did The District Court Err In Finding Mother's Unfitness Was Unlikely To Change In The Foreseeable Future?

The district court's conclusion that the conduct or condition rendering Mother unfit is also unlikely to change in the foreseeable future must also be supported by clear and convincing evidence. K.S.A. 2020 Supp. 38-2269(a). We examine the foreseeable future from the perspective of a child. In re K.L.B., 56 Kan. App. 2d at 447. A parent's past conduct can provide the court with some measure of insight into the parent's future behavior. 56 Kan. App. 2d at 447. The standard of review we relied on for the first issue applies equally here:

> "'When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable,

25

i.e. by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]'" *K.L.B.*, 56 Kan. App. 2d at 445.

Again, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 56 Kan. App. 2d at 445.

The court's conclusion that Mother's conduct was unlikely to change in the foreseeable future arose out of several key points in the evidence. In their entirety, those factors were significant to the court because they explained that even though the family was three years into the case, Mother persisted in failing to defer to the best interests of the Children. Of note, Mother received a citation for a suspended license shortly after her release from jail. She neglected to address the issue, however, and received a second citation about a month later. From the court's perspective, Mother was aware of the impending termination trial, yet rather than solve the traffic matter and prove a new sense of responsibility, she opted to let it languish. In a similar vein, the court found that Mother's continued criminal conduct was on an evolutionary path toward more serious situations. It pointed to the potential prison sentence attached to Mother's pending felony charge in Lyon County as evidence of that conclusion. The court also found Mother's plea for more time to work toward reintegration troubling. It viewed the request along with Mother's failure to recognize the role that this case and her conduct played in the nightmares the Children often experienced. In the eyes of the court, a collective view of those factors conveyed that Mother still failed to appreciate the overall impact the case had on the Children and the emotional strain they had the potential to suffer if asked to endure further delays.

Mother contends that the evidence did not support finding that her unfitness was unlikely to change. She directs our attention to *In re K.V.*, No. 121,180, 2019 WL 6041460 (Kan. App. 2019) (unpublished opinion) and *In re L.D.*, No. 119,613, 2019 WL 257979 (Kan. App. 2019) (unpublished opinion), and asserts that like the parents in these

26

cases, her circumstances had changed significantly. Not surprisingly, the State asserts that given the totality of Mother's history, the district court made the appropriate decision.

The cases Mother cites do not compel a finding that the district court reached its conclusion in error. In *In re K.V.*, the district court found the child's mother unfit but concluded that because she made "substantial progress" on her case plan in the five months before the termination hearing, a determination that her unfitness was unlikely to change in the foreseeable future was not warranted at that time. The district court held the next hearing a few months later, but mother did not appear. Since mother was "on a really short leash" from the prior hearing, the district court terminated her rights. 2019 WL 6041460, at *2-3.

On review, a panel of this court found that other than mother's absence at the hearing, the record lacked any evidence describing mother's actions or inactions between the two hearings. Thus, the evidence of unfitness that existed at the time of the first hearing—which the district court ruled did not support a conclusion that Mother's unfitness was unlikely to change in the foreseeable future—could not support a later finding that a transformation was unlikely. 2019 WL 6041460, at *4. We concluded that there was not clear and convincing evidence to support the district court's finding that mother's unfitness was unlikely to change in the foreseeable future. 2019 WL 6041460, at *4.

*In re K.V.* is distinguishable from the instant case. In *In re K.V.*, the district court, after hearing all the evidence at the termination hearing, concluded that it was not yet clear whether the mother's unfitness was unlikely to change in the foreseeable future. At the new hearing, despite no appreciable change in the evidence, the district court did an about face and determined the mother's unfitness was unlikely to change. By contrast, the court here heard evidence of Mother's minimal and delayed progress during the

27

termination hearing and concluded that based on the evidence, Mother was unlikely to modify her behavior in the foreseeable future.

The second case Mother cites is a bit more on point. In *In re L.D.*, the district court found mother unfit and that mother's unfitness was unlikely to change in the foreseeable future. 2019 WL 257979, at \*4. On appeal, this court concluded there was insufficient evidence to support the finding that the mother's unfitness was unlikely to change for now. We found that the district court "offered scant reasoning for its conclusion that [mother]'s drug abuse would recur in the foreseeable future" and highlighted that the evidence showed mother "took a substantial step toward meaningful change." 2019 WL 257979, at \*4, 5. Specifically, the mother completed inpatient treatment and the evidence did not establish that her failure would be inevitable, or probable given that she had not been through drug treatment before and intended to continue counseling to prevent relapse. 2019 WL 257979, at \*4. The court also pointed out that because the child remained with the mother during the case and did well in her care, the child time measurement for the foreseeable future was less prominent than in those cases in which the child is in State custody. 2019 WL 257979, at \*5.

Mother accurately observes that her case shares some similarities with *In re L.D.* in that she too exhibited some measure of progress in the few months leading up to the termination hearing in the way of substance abuse treatment and mental health care. At any rate, two reasons render her case distinguishable.

First, there was evidence presented to the district court which exhibited that Mother's progress might suffer a limited lifespan. Thompson informed the court that Mother demonstrated commitment at the start of the case, but her compliance declined over time. Additionally, while Mother testified to being drug free since June 2019, the court received evidence that her UA in July of that year was positive for amphetamines and methamphetamines and her September UA was positive for marijuana. As for the

latter test, Mother proffered the questionably plausible explanation that it was perhaps because she borrowed a coworker's vape pipe. She also failed to show for two other UAs scheduled in September. Finally, during cross-examination, Mother admitted that her attendance at therapy had not been as consistent as perhaps her direct testimony conveyed.

Second, unlike *In re L.D.* the Children here were not in Mother's care. The panel in *In re L.D.* reasoned that the child time measurement for considering the foreseeable future is less of a factor when the family is together. Thus, here it is a much more prominent factor, which the district court acknowledged by finding that it was unfair to ask the Children to wait any longer for permanency. This case was pending for three years prior to termination, and while Mother may believe that reintegration with the Children can occur in relatively short order, any additional time is a significant period in child time. For instance, E.A.E. spent more time out of Mother's custody than she ever did living with Mother. Mauer informed the court that all the Children were thriving in their current placements and given its extended duration, it was time for the case to be closed.

In sum, the authority Mother cites does not cause the conclusion that the district court erred in determining her unfitness was unlikely to change in the foreseeable future. Further, contrary to Mother's assertion, evidentiary foundation for the district court's decision extended well beyond the issue of Mother's traffic citations. For instance, the court's ruling likewise includes concerns about the likelihood that Mother could face a prison sentence, that she failed to recognize and appreciate the effect her actions had on the Children, and that Mother's request for additional time was "too long to wait."

The district court properly considered the time already afforded to Mother, as well as the unlikelihood that Mother would quickly change her circumstances, and reasonably concluded that more time was not in the best interest of the Children. We find no error in

29

that decision. Consequently, having carefully reviewed the record before us, we also find that the district court's conclusion that the termination of Mother's parental rights as being in the best interest of the Children was also supported by clear and convincing evidence.

Affirmed.